IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NARICA HAMILTON

    v.                     :   Civil Action No. DKC 17-2300

PRINCE GEORGE'S COUNTY,
MARYLAND

## MEMORANDUM OPINION

Presently pending and ready for resolution are the motion for summary judgment filed by Defendant Prince George's County, (ECF No. 40); the motion to strike or seal filed by Plaintiff NaRica Hamilton (ECF No. 44); the consent motion for leave to file excess pages filed by Plaintiff (ECF No. 46); the motion to seal filed by Defendant (ECF No. 52); the motion to seal filed by Plaintiff (ECF No. 54); and the motion for leave to file a sur-reply filed by Plaintiff (ECF No. 56). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, Defendant's motion for summary judgment will be granted in part and denied in part; Plaintiff's motion to strike will be denied; both Plaintiff's and Defendant's motions to seal will be granted; Plaintiff's motion for leave to file excess pages will be granted; and Plaintiff's motion for leave to file a sur-reply will be denied.

## I.  Background

### A.  Factual History

The following facts are presented in the light most favorable to Plaintiff, the non-moving party for the purposes of Defendant's summary judgment motion.

Prince George's County Police Department hired Plaintiff Corporal NaRica Hamilton ("Cpl. Hamilton") in 2006.  At all relevant times, Plaintiff was the only female in her unit, and her immediate supervisor was Sergeant Gerald Manley ("Sgt. Manley"), a male.

Beginning in August of 2015, there was an escalation in tension between Cpl. Hamilton and Sgt. Manley.  That month, Sgt. Manley made a joke about Cpl. Hamilton's private life in front of other squad members.  (ECF No. 49-1, at 30).  In early October, Sgt. Manley instructed Cpl. Hamilton to visit Laurel High School and Cpl. Hamilton refused based on her discomfort being around the school's principal. When Cpl. Hamilton turned up at the station after this refusal, Sgt. Manley yelled at her.  (ECF No. 40-6, at 35).  On October 7, 2015, Plaintiff expressed her concern about the discrimination she was experiencing to her Lieutenant, Lt. Adam Popielarcheck ("Lt. Popielarcheck").  On October 8, Cpl. Hamilton sent an e-mail to Shop Steward Gerald Knight of the Fraternal Order of Police ("FOP") complaining of "sexist" behavior by Sgt. Manley. (ECF No. 49-13).  In an October 14 squad meeting, Sgt. Manley spoke to Cpl. Hamilton in a demeaning tone, refusing to answer her questions, and referring to her

repeatedly by her first name. (ECF No. 40-6, at 42-43). Cpl. Hamilton left the meeting to complain to Lt. Popielarcheck, only to have their one-on-one meeting interrupted by Captain Adam Parker ("Cpt. Parker"), who instructed them to return to Sgt. Manley's meeting. Once they had returned, Cpt. Parker – addressing the entire squad – cautioned the squad about making complaints to the FOP. (ECF No. 49-1, at 31). Five days later, Cpl. Hamilton asked Sgt. Manley to turn down the volume of a radio program he was listening to which was demeaning to women and minorities. Sgt. Manley refused. (ECF No. 29, at 7). On October 22, Plaintiff filed a formal complaint with the police department. (ECF No. 49-11)

On October 26, Plaintiff found out she was pregnant, and her doctor told her that she needed to be placed on light duty because of complications from the pregnancy. Plaintiff requested an accommodation to ensure she did not have to a) stand for long periods, b) drive more than 60 miles each day (i.e., drive more than her roughly 25-30 mile commute each way to and from work), or c) lift more than twenty pounds. The request was granted on November 2, and Plaintiff was transferred to the Records Department. Even though Plaintiff was not supposed to drive other than from home to work and back, she was asked to drive to the station on November 10, 11, and 12. (ECF No. 40-6, at 75-78).

Cpl. Hamilton was asked to make these additional drives to review and sign her performance review. On that performance review, Cpl.

3

Hamilton received an overall score of 2.7, which is labelled as "SATSIFACTORY". (ECF No. 49-24, at 1). Cpl. Hamilton complained about this score, however, and it was ultimately revised upward to a score of 2.85 which "EXCEEDS SATISFACTORY". *Id.* Cpl. Hamilton was nonetheless unhappy with both scores and with the substantive comments on her performance review, as they were worse than in all her previous reviews. (ECF No. 40-6, at 26).

Plaintiff found out that she had had a miscarriage on or about November 16. *Id.* at 60. Plaintiff then went on leave due to the complications from her pregnancy and miscarriage. When she returned, Cpl. Hamilton immediately sought a transfer from her COPS unit to a patrol unit. *Id.* at 62. Cpl. Hamilton was ultimately granted a transfer request to a patrol assignment and involuntarily reassigned to the night shift. *Id.* at 62-63.

### B. Procedural Background

On June 23, 2017, Plaintiff filed suit in the Circuit Court for Prince George's County, Maryland, against Prince George's County and the Prince George's County Police Department. (ECF No. 2). Plaintiff brought 16 claims under an assortment of federal and state laws alleging discrimination on the basis of sex, pregnancy, disability and related claims of retaliation. On August 11, Defendant Prince George's County removed the case. Defendant Prince George's County moved to dismiss, or in the alternative, for summary judgment on September 15. (ECF No. 14). Plaintiff responded (ECF No. 17), and Defendant replied

(ECF No. 20).

On April 16, 2018, the court granted in part and denied in part Defendant's motion for summary judgment. (ECF No. 23). Plaintiff subsequently requested and was granted leave to file an Amended Complaint. (ECF No. 29). Plaintiff's remaining claims in the Amended Complaint are 1) Gender Discrimination under Title VII of the Civil Rights Act ("Title VII") (Count I); 2) Hostile Work Environment under Title VII (Count II); 3) Retaliation under Title VII (Counts III and VIII); 3) Disability Discrimination and Failure to Accommodate under the Americans with Disabilities Act (the "ADA") (Counts IV and VI); 4) Retaliation under the ADA (Count V); and 5) Discrimination on the Basis of Pregnancy under Title VII (Count VII). Defendant moved for summary judgment on all counts of the Amended Complaint on January 15, 2019. (ECF No. 40). The parties agreed by a consent motion to grant Plaintiff an extension of time to file her opposition. (ECF No. 41). That motion sought an extension for Plaintiff to file her opposition to the motion for summary judgment until February 15 and for Defendant to reply by March 1. *Id.* The court's paperless order erroneously granted Plaintiff until March 1, 2019 to file her Opposition, simply inserting the date of the reply (ECF No. 43). The court apologizes for this error. Neither Plaintiff nor Defendant opposed this order nor raised the issue with the court.

On February 15, 2019, Plaintiff moved to strike certain sections of the motion for summary judgment. (ECF No. 44). The court issued

a paperless order on the same day, directing the Clerk to place Defendant's motion for summary judgment, and plaintiff's motion to strike and/or seal temporarily under seal until the resolution of the motion to strike and/or seal. (ECF No. 45). The court also directed the parties to file redacted versions of the papers on the public docket (ECFs No. 47 & 48). Plaintiff then filed a consent motion for leave to file excess pages in its Opposition to Defendant's motion for summary judgment. (ECF No. 46). Plaintiff subsequently filed her over-long opposition on February 27, 2019. (ECF No. 49). Defendant filed a motion to seal its opposition to plaintiff's motion to strike on March 5, 2019, (ECF No. 52), and then filed its reply in support of its motion for summary judgment on March 13. (ECF No. 53). Plaintiff then filed her own motion to seal her reply to Defendant's opposition to motion to strike or seal on the same day. (ECF No. 54). Finally, Plaintiff filed a motion for leave to file a sur-reply, (ECF No. 56), which Defendant opposed (ECF No. 57).

## II. Motion for Summary Judgment

### A. Standard of Review

Summary judgment will be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Liberty Lobby*, 477 U.S. at 249. In undertaking this inquiry, a court must view the facts "in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005), but a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences," *Shina v. Shalala*, 166 F.Supp.2d 373, 375 (D.Md. 2001) (citation omitted).

To prevail on a motion for summary judgment, the moving party generally bears the burden of showing that there is no genuine dispute as to any material fact. No genuine dispute of material fact exists, however, if the nonmoving party fails to make a sufficient showing on an essential element of his case as to which he would have the burden of proof. *Celotex*, 477 U.S. at 322–23.

**B.  Analysis**

**1.   The Retaliation Claims**

Cpl. Hamilton brings three separate retaliation claims: two of them under Title VII and one under the ADA.

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show that: 1) she engaged in a protected activity, 2) her employer took a materially adverse action against her and 3) a causal connection existed between the activity and the adverse

action. *See Adams v. Anne Arundel County Public Schools*, 789 F.3d 422, 429 (4th Cir. 2015).

Cpl. Hamilton brings two distinct, but similar, Title VII claims. Cpl. Hamilton contends that 1) she engaged in a protected activity when she complained publicly about her treatment, when she sought assistance from Lt. Popielarcheck, when she e-mailed Shop Steward Knight, and when she complained to the EEOC coordinator; 2) she suffered an adverse employment action in the form of a lower Past Performance Appraisal, a "subsequent hostile work environment," the "denial of request for assistance, and revised workload" and a "threat by Captain Parker," (ECF No. 29, at 11); and that there was a causal connection between 1) and 2). As to her second Title VII retaliation claim, brought pursuant to the Pregnancy Discrimination Act, Cpl. Hamilton claims that she: 1) engaged in a protected activity by requesting light duty due to her high risk pregnancy, 2) suffered an adverse employment action in the form of a lower performance evaluation, transfer to the Records Department, and "subsequent hostile work environment, denial of request for assistance, and revised workload[,]" *id.* at 18, and 3) that 1) and 2) were causally linked. *Id.*

An action is sufficiently "adverse" to support a Title VII retaliation claim if it "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Booth v. Cty. Exec.*, 186 F.Supp.3d 479, 488 (D.Md. 2016) (citing *Burlington Northern*

8

& *Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006) ("Burlington Northern"). This standard is easier for plaintiffs to meet than in the Title VII discrimination context, as it encompasses actions "beyond workplace-related or employment related retaliatory acts and harm." *Wonasue v. University of Maryland Alumni Ass'n*, 984 F.Supp.2d 480, 492 (D.Md. 2013) (citing *Burlington Northern,* 548 U.S. at 67-70). That does not mean, however, that *any* retaliatory actions will suffice. *Id*. Employees are only protected "from retaliation that produces an injury or harm," *i.e.* "materially adverse actions," as opposed to "trivial" ones. *Cepada v. Bd. Of Educ. of Baltimore Cty.*, 814 F.Supp.2d 500, 515 (D.Md. 2011) (citing *Burlington Northern,* 548 U.S. at 67-69).

### a. Adverse Employment Actions

Cpl. Hamilton bases her Title VII retaliation claims on several alleged "adverse employment actions": 1) the drop-off in her performance review, 2) the "hostile work environment" she suffered from after taking her protected action, 3) denial of a request for assistance, 4) her "revised workload", 5) her "transfer to the Records Department," and 6) a "threat" from Cpt. Parker. (ECF No. 29 at 11, 18). Again, in order to establish a *prima facie* case, Plaintiff must show that each of these actions was *materially* adverse *and* causally linked to a protected activity. With regard to all but one of these actions, Plaintiff has failed to make a sufficient showing on at least

one of the essential elements of a retaliation claim.  *Celotex*, 477
U.S. at 322-23.

### 1)  **Lower Performance Reviews**

In support of her Title VII retaliation claims, Cpl. Hamilton
argues that "negative comments [on her performance reviews] would be
concerning during transfer requests or other employment opportunities"
and that this "demonstrate[s] the negative effect of the score on
Plaintiff." (ECF No. 49-1, at 33).  Plaintiff cites an out-of-circuit
opinion from the United States District Court for the District of
Columbia for the proposition that "[a]n improperly lowered Part
Performance Appraisal score can constitute an adverse job action,
particularly when it causes the employee to lose a performance award."
*id.*, at 32 (citing *Vance v. Chao*, 496 F.Supp.2d 182, 185-86 (D.D.C.
2007)).  That early case, however, was resolving a motion to dismiss
and the plaintiff had also alleged that the lower rating resulted in
the loss or deniel of a bonus and being placed on a performance
improvement plan.

Courts in this district have rejected retaliation claims based
on poor or poorer performance reviews, even after *Burlington Northern*.
In *Van Story v. Washington Cty. Health Dept*, No. CV ELH-17-3590, 2019
WL 3340656, at *18 (D. Md. July 25, 2019), Judge Hollander explained:

> In [*Strothers v. City of Laurel, Maryland*, 895
> F.3d 317, 327 (4th Cir. 2018)], the Fourth Circuit
> explained that an "adverse *employment* action" is
> not the standard in a retaliation case. (Emphasis

added.) In other words, the adverse action "need
not be employment or workplace-related in order
to sustain a retaliation claim." *Id*. In a
retaliation claim, the standard for an adverse
action is more lenient than for a substantive
discrimination claim. *Burlington Northern & Santa
Fe Ry. Co. v. White*, 548 U.S. 53, 64, 126 S.Ct.
2405, 165 L.Ed.2d 345 (2006) ("Burlington
Northern") ("[T]he antiretaliation provision,
unlike the substantive provision, is not limited
to discriminatory actions that affect the terms
and conditions of employment.").

In the retaliation context, the plaintiff must
show merely that the challenged action "well might
have dissuaded a reasonable worker from making or
supporting a charge of discrimination." *Id*. at 68,
126 S.Ct. 2405 (quotation marks and citations
omitted). In the context of Title VII, the
antiretaliation provision "does not protect
against 'petty slights, minor annoyances, and
simple lack of good manners.' " *Geist v.
Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 738 (D.
Md. 2009) (quoting *Burlington Northern*, 548 U.S.
at 68, 126 S.Ct. 2405). Nor do any of the following
constitute an adverse action in a retaliation
claim: "failing to issue a performance appraisal;
moving an employee to an inferior office or
eliminating the employee's work station;
considering the employee 'AWOL'; or issuing a
personal improvement plan, 'an Attendance
Warning,' a verbal reprimand, 'a formal letter of
reprimand,' or 'a proposed termination.' " *Wonasue
v. Univ. of Maryland Alumni Ass'n*, 984 F. Supp.
2d 480, 492 (D. Md. 2013) (internal quotation
marks omitted in part) (quoting *Rock v. McHugh*,
819 F. Supp. 2d 456, 470-71 (D. Md. 2011)). A poor
performance review or reprimand does not
constitute an adverse action unless it causes
"real harm to [the plaintiff's] employment or is
an intermediate step to discharge." *Amirmokri v.
Abraham*, 437 F. Supp. 2d 414, 423 (D. Md. 2006),
aff'd, 266 F. App'x 274 (4th Cir. 2008) (citation
omitted); see also *Jeffers v. Thompson*, 264 F.
Supp. 2d 314, 330 (D. Md. 2003) ("Like a
reprimand, a poor performance rating does not in
itself constitute an adverse employment action.

'Rather, it is a mediate step, which, if relied
upon for a true adverse employment action (e.g.,
discharge, demotion, etc.) becomes relevant
evidence.'") (internal citation omitted) (quoting
*Settle v. Balt. Cty.*, 34 F. Supp. 2d 969, 1010 (D.
Md. 1999)).

There is nothing in the record to suggest that Plaintiff's
performance review was relied upon for a true adverse employment
action. The reduction in Plaintiff's performance review score does
not constitute an adverse employment action for the purposes of Title
VII Retaliation.

### 2) Hostile Work Environment as Retaliatory Adverse Action

Plaintiff next argues that she suffered an adverse employment
action in the form of "[t]he subsequent hostile work environment" that
she suffered from following her protected actions. (ECF No. 29, at
11, 18). Cpl. Hamilton does not support this allegedly adverse
employment action with any degree of particularity. In fact, the
timeline regarding this "adverse employment action" is decidedly
muddled, and it is unclear which elements of the hostile work
environment Cpl. Hamilton viewed as "retaliation," and which elements
of the hostile work environment preceded Cpl. Hamilton's taking a
protected action.

The Fourth Circuit has "recognized – in the Title VII context –
that 'retaliatory harassment' may constitute a materially adverse
action," *Feminist Majority Found. V. Hurley*, 911 F.3d 674, 694 (4th
Cir. 2018), but Plaintiff's muddling of the various examples of

harassment means she has not established the requisite "causal link" between harassment and protected activity. Cpl. Hamilton argues that she was harassed, that she complained about the harassment, and that the harassment continued after the complaint. On this record, even assuming that harassment sufficient to constitute an adverse employment action occurred, Plaintiff has by no means shown that the *continuation* of Sgt. Manley's harassment after her complaints was causally linked to the complaints themselves.

### 3) Denial of Request for Assistance

Plaintiff next argues that she suffered a retaliatory adverse employment action in the form of a "denial of request for assistance[.]" (ECF No. 29, at 11, 18). It is entirely unclear from Plaintiff's papers to which "denial of request for assistance" she is referring. Plaintiff at one point states that she "complained to Lieutenant Popielarcheck. . . about these events of October 7 and 14, 2015, but nothing was done." *Id*. at 7. Plaintiff also suggests that "Sergeant Angela Lane was supposed to request that Sergeant Manley travel to Plaintiff to serve her with the Past Performance Appraisal to accommodate her light duty restrictions not to drive long distances, [but] Sergeant Manley refused to travel to her." *Id*. at 6. These appear to be the only "denials of requests for assistance" alleged in Plaintiff's Amended Complaint. In her opposition to Defendant's motion for summary judgment, Plaintiff appears not to rely on any

"denial of request for assistance" as evidence of a materially adverse employment action.

Plaintiff is not so much alleging that her employers *retaliated* against her for engaging in a protected activity as she is arguing that her employers *ignored* her protected activity. In essence, she is not arguing retaliation, but inaction. The Fourth Circuit, however, has held that inaction does not give rise to a retaliation claim where a Plaintiff's "employment status remained the same, as did her wages and terms of employment." *Cooper v. Smithfield Packaging Company, Inc.*, 724 Fed.Appx. 197, 202 (4th Cir. 2018) (finding no adverse employment action where employers failed to investigate Plaintiff's sexual harassment complaint, failed to transfer Plaintiff or her supervisor, and disregarded her concerns that superintendent's conduct was affecting her ability to work). Thus, the denial of Plaintiff's request for assistance cannot constitute an adverse employment action.

### 4) The "Revised Workload" and Transfer to the Records Department

Plaintiff next alleges that she suffered an adverse employment action in the form of a "revised workload" and her transfer to the Records Department. (ECF No. 29, at 11, 18). It is not entirely clear from the Amended Complaint or her Opposition brief what Cpl. Hamilton means by "revised workload." It seems, however, that Plaintiff is here alluding to her "involuntary shift change from day to night shift . . . [which] changed the nature of her work[.]" *Id.*

14

at 7-8. Plaintiff ties this "revised workload" in the very next sentence to her move to the Records Department. *Id*. at 8. The muddling of these two adverse employment actions is not the only case where Plaintiff's claims surrounding these events are difficult to make out. In one breath, Plaintiff claims this change was involuntary, even retaliatory. *Id*. Yet in another, she claims that her transfer to the Records Department was a result of her requesting "light duty" due to her pregnancy. *Id*. at 6. Likewise, Plaintiff at one point claims she "was forced to request a transfer," (ECF No. 49-1, at 33). Whether Plaintiff meant that she was forced to request a transfer because of her pregnancy, or forced to request a transfer because of Sgt. Manley's conduct towards her is unclear.

In either case, Plaintiff's transfer and new work duties are not actionable adverse employment actions in a Title VII retaliation case. The decision in *Adams*, 789 F.3d at 429-30, forecloses Plaintiff's arguments. In that case, the court held that there was no adverse employment action where Plaintiff was "transferred to a different and less stressful school," and where the plaintiff was "reportedly not averse to the possibility of being [re]assigned[.]" Far from being "not averse" to reassignment, Cpl. Hamilton actively requested it. Even if the reassignment were a result of Cpl. Hamilton's desire to get away from Sgt. Manley – and not, as she concedes, a result of her pregnancy – this would still not necessarily constitute an adverse

employment action. *See Von Gunten v. Maryland*, 243 F.3d 858, 868-69 (4th Cir. 2001).

Finally, Cpl. Hamilton's transfer to the night shift cannot constitute an adverse employment action. While that change may have been undesirable, plaintiff does not allege it led to any "diminution in pay" or other similar adverse impact. *See Chika v. Planning Research Corp.*, 179 F.Supp.2d 575, 587 (D.Md. 2002) (holding that undesirable transfer to night shift "[w]hile inconvenient. . . does not automatically constitute an adverse employment action.") *See also Tawwaab v. Virginia Linen Service, Inc.* 729 F.Supp.2d 757 (D.Md. 2010) (noting that reassignment to a position that is not "dirtier, more arduous, less prestigious, [and] objectively inferior" is not an adverse employment action.)

Additionally, and perhaps more obviously, the fact that Cpl. Hamilton requested both her transfer to Records and her transfer to patrol belies the argument that the transfer was "causally linked" to any protected activity. The only inference to be drawn from the fact that Cpl. Hamilton requested and then received a transfer is that the transfer was granted because it was requested, and not, as Cpl. Hamilton implicitly argues, to "dissuade[ her] from making or supporting a charge of discrimination." *Burlington Northern,* 548 U.S. at 67-68. Even if Cpl. Hamilton requested a transfer *because* of adverse, discriminatory employment actions, the granting of that request does not itself give rise to a retaliation claim. To hold

otherwise would be to provide perverse incentives for employers and employees alike: if employers may be held liable for granting employees' requests to be transferred away from hostile or demeaning supervisors, then they understandably might be unlikely to do so.

In sum, Plaintiff has fallen well short of establishing that her transfer was either adverse, or causally linked to a protected activity.

### 5) The "Threat" from Captain Parker

Again, the lenient retaliation standard requires Plaintiff to establish only that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Munive v. Fairfax County School Board*, 700 Fed.Appx.288 (Mem), 289 (4th Cir. 2017) (citing *Burlington Northern,* 548 U.S. at 68). At least one court has found *threats* of retaliation sufficient to constitute an "adverse employment action" in the retaliation context. *See E.E.O.C. v. Cognis Corp.*, No. 10-CV-2182, 2011 WL 6149819, at *7 (C.D. Ill. Dec. 12, 2011).

In order to show causation, Plaintiff *must* establish that Cpt. Parker knew Cpl. Hamilton engaged in a protected activity. *See Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) ("the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case"); *see also, Causey v. Balog*, 162 F.3d

795, 803-04 (D.Md. 1998) ("Knowledge of a charge is essential to a retaliation claim").

As for the "protected activity," Title VII prohibits retaliation against an employee who has "opposed any practice made an unlawful employment practice" by Title VII. 42 U.S.C. § 2000e-3(a). The Fourth Circuit "as well as the other Courts of Appeals, also has articulated an expansive view of what constitutes oppositional conduct, recognizing that it 'encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities.'" *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015) (citing *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259). Under this "expansive view," complaints of discrimination made to an FOP shop steward constitute protected activity. *See, e.g.*, *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516 (6th Cir.2009) (protected activity includes "complain[ing] about unlawful practices to a manager, *the union*, or other employees") (emphasis added).

Proper analysis requires examining what Cpt. Parker knew and when, and what potentially protected activities Cpl. Hamilton took and when. On October 7, Cpl. Hamilton met with Lt. Popielarcheck and Sgt. Manley. (ECF No. 40-6, at 34). At this meeting, Plaintiff discussed her discomfort with the way Sgt. Manley had treated her following the Laurel High School incident. *Id*. Cpl. Hamilton did not suggest, in that meeting, that she felt that Sgt. Manley's actions were based on

18

Cpl. Hamilton's race, gender, or pregnancy. *Id*. at 35. The next day, Cpl. Hamilton sent an e-mail to Shop Steward Knight complaining of "sexist" behavior by Sgt. Manley. (ECF No. 49-13). Shop Steward Knight communicated portions of that e-mail directly to Sgt. Manley and Lt. Popielarcheck and "might have spoken with the major or captain about it." (ECF No. 49-15, at 27). There were then a series of meetings the following week. According to Cpl. Hamilton, there was an "initial meeting" with the entire squad at which neither Cpt. Parker nor Lt. Popielarcheck were present. (ECF No. 40-6, at 37-38). At this initial meeting, Sgt. Manley was rude to Cpl. Hamilton, allegedly speaking to her at a demeaningly slow pace and noting that he was doing so to avoid yelling at her. *Id*. at 39. Sgt. Manley did not, however, make any comments based on Cpl. Hamilton's race, gender, or pregnancy. *Id*. at 41.

After Sgt. Manley refused to stop calling Cpl. Hamilton by her first name, Cpl. Hamilton excused herself from this initial meeting and went to Lt. Popielarcheck again to complain about Sgt. Manley's rude and demeaning behavior. *Id*. at 41-43. During their brief, one-on-one meeting, Cpt. Parker interrupted and instructed both Cpl. Hamilton and Lt. Popielarcheck to rejoin the squad meeting. *Id*. at 42. It was at this point, once Cpl. Hamilton and Lt. Popielarcheck had rejoined Sgt. Manley's staff meeting, that Cpt. Parker spoke up, addressing the whole squad and telling them that the unit was "skating on thin ice so be careful what you complain about." *Id*. at 120.

Plaintiff states in her opposition that Cpt. Parker made this statement with regard to complaints made to the Fraternal Order of Police. (ECF No. 49-1, at 31).

On this record, Plaintiff has produced evidence of all three elements of a *prima facie* case. First, as stated above, Plaintiff's e-mail to Shop Steward Knight constitutes a protected activity. Second, under the lenient retaliation standard, a reasonable jury could well find that Cpt. Parker's "threat" regarding complaints to the FOP would dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern,* 548 U.S. at 67–68. Between the temporal proximity, and the fact that Cpt. Parker apparently specifically referenced FOP complaints, Plaintiff has, at this stage, established that Cpt. Parker's threat and the e-mail to Shop Steward Knight were causally linked.

### 2. The Hostile Work Environment Claim

Cpl. Hamilton's hostile work environment claim operates under a distinct, yet similar standard. Instead of requiring an "adverse employment action," a claim for a hostile work environment under Title VII requires a plaintiff to establish that the issues rendering the work environment "hostile" are "sufficiently severe or pervasive **to alter the condition of the victim's employment**[.]" *Boyer-Liberto v. Fontainbleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (emphasis added).

In order to establish a *prima facie* case of hostile work environment under Title VII, a plaintiff must show harassment that was

1) unwelcome, 2) because of Plaintiff's sex, 3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and 4) that there is some basis for imposing liability on the employer. *See Ocheltree v. Scollon Productions, Inc.*, 335 F.3d 325 (4th Cir. 2003). Plaintiff's hostile work environment claim fails to meet a number of these factors, but, as with most of her claims, the most notable failure is her inability to establish the third prong. Any issues of discrimination or harassment were simply not severe or pervasive enough to alter the conditions of her employment.

The "severity and persistency" prong is analyzed in light of the totality of the circumstances, which include: 1) the frequency of the discriminatory conduct; 2) its severity; 3) whether it is physically threatening or humiliating, or a mere offensive utterance; and 4) whether it unreasonably interferes with an employee's work performance. *See Foster v. Univ. of Maryland E. Shore*, 908 F.Supp.2d 686, 698 (D.Md. 2012). The Fourth Circuit has noted explicitly that the "severity and persistency" prong is a "high bar," *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008), and that intermittent acts of harassment are insufficient to establish that a hostile work environment is severe or pervasive. *Green v. A. Duie Pyle, Inc.*, 371 F.Supp.2d 759, 762-63 (D.Md. 2005). The "standard for proving an abusive work environment is intended to be a very high one because the standard is designed to filter out complaints attacking

'the ordinary tribulations of the workplace.'" *Wang v. Metro. Life Ins. Co.*, 334 F.Supp.2d 853, 864 (D.Md.2004). "Courts usually only allow hostile work environment claims to proceed where the [harassment] is near constant, oftentimes of a violent or threatening nature, or has impacted the employee's work performance." *Tawwaab*, 729 F.Supp.2d at 777.

Plaintiff cannot meet this high bar. Plaintiff claims that the harassment she faced "escalated to a hostile work environment in August 2015." (ECF No. 49-1, at 30). The examples of harassment Plaintiff cites in that time are 1) a joke, on our about August 2015, that Sgt. Manley made "about private information nregarding Plaintiff's personal circumstances to other members of the squad," (ECF No. 29, at 4); 2) a request, via text, from Sgt. Manley that Cpl. Hamilton go to Laurel High School, followed by an altercation where Sgt. Manley yelled at Cpl. Hamilton for not going, *id.*; 3) an October 14 meeting where Sgt. Manley spoke to her "in a demeaning tone" and refused to explain himself to her, stating, "I am the sergeant, I don't have to explain myself to you, but since you are crying about the issue, I will explain," *id.* at 5; 4) an October 19 incident in which Sgt. Manley was listening to a Rush Limbaugh radio program which discussed women and minorities in a discriminatory manner and Sgt. Manley refused to turn down the volume upon a request from Cpl. Hamilton, *id.* at 7; 5) a poor performance review issued on November 13, *id.*; 6) Sgt. Manley's refusal to travel to Cpl. Hamilton to bring Cpl. Hamilton her

performance review, *id*. at 6-7; and 7) an allegedly involuntary change to working the night shift, *id*. at 7.

Cpl. Hamilton describes roughly seven incidents of harassment over the course of five months, with allusions to other incidents or implications that these incidents were part of a broader pattern. Taking these allegations in the light most favorable to Cpl. Hamilton, these incidents are still not enough to meet the "severity and pervasiveness" requirement. *Ward v. Acme Paper & Supply Co.*, 751 F. Supp. 2d 801, 806-07 (D. Md. 2010), is very closely on point, and highly instructive:

> The Fourth Circuit has recognized that "plaintiffs must clear a high bar in order to satisfy the severe or pervasive test." [*Equal Employment Opportunity Comm'n v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir.2008).] For instance, "complaints premised on nothing more than rude treatment by coworkers, ... callous behavior by one's supervisor, ... or a routine difference of opinion and personality conflict with one's supervisor" are not actionable. *Id*. (internal quotation marks, citations, and alterations omitted). In the present case, Mr. Pollack's decision not to accommodate Ms. Ward's weight-lifting restriction, while possibly discriminatory, was too isolated an incident to constitute severe and pervasive conduct. *See Pueschel v. Peters*, 577 F.3d 558, 566 (4th Cir.2009) (affirming district court's decision that "isolated personnel decisions" were "not actionable" for purposes of a hostile work environment claim because they were not severe or pervasive). Mr. Cheeks's remarks immediately following the news of Ms. Ward's pregnancy were rude and callous, but similarly isolated. See *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 773

(4th Cir.1997) (finding that even assuming allegations of four gender-based comments were true, they were so "trivial" and "isolated" that they were not severe or pervasive). Because the alleged misconduct was not severe and pervasive, Ms. Ward's hostile work environment claim will be denied.

As in *Ward*, because the alleged conduct here was neither sufficiently pervasive, nor sufficiently severe, the court will grant defendant's motion for summary judgment as to the hostile work environment claim.

### 3. The Discrimination Claims

Plaintiff brings two claims of Title VII discrimination: one on the basis of her sex, another on the basis of her pregnancy. As stated above, Plaintiff has failed to establish that any of the adverse actions allegedly taken against her met the standards of a retaliation or hostile work environment claim under Title VII. It follows, then that Cpl. Hamilton also fails to meet the standard required under her Title VII Discrimination claims.

In order to survive summary judgment on a Title VII discrimination claim, plaintiff must show that (1) she is a member of a protected class; (2) her job performance was satisfactory; (3) she suffered an adverse employment action; and (4) she was treated differently from similarly situated employees outside the protected class. *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir.2010). As with most of her other claims, Plaintiff has not established that she suffered an adverse employment action.

Unlike in the retaliation context, in order to constitute an adverse employment action for a discrimination claim, the action must be discriminatory and must "adversely affect 'the terms, conditions, or benefits' of the plaintiff's employment." *James v. Booz-Allen & Hamilton*, Inc., 368 F.3d 371, 375 (4th Cir. 2004). Having an employer berate or humiliate you is not enough to constitute an adverse employment action. *See Booth v. Cty. Exec.*, 186 F.Supp.3d at 485-486; *see also Cepada*, 814 F.Supp.2d at 515 (holding that being "yelled at" and "criticized" did not constitute an adverse employment action under the more lenient standard for such actions applied to Title VII retaliation claims); *Blount v. Dep't of Health & Human Servs.*, 400 F.Supp.2d 838, 842 (D.Md.2004) (holding that "disparaging remarks made by a supervisor," including statements alleged to have embarrassed the employee in front of co-workers, "do not state an adverse employment action"). "[R]educed opportunity for promotion," can constitute a potential adverse employment action, *see Stoyanoc v. Mabus*, 126 F.Supp.3d 531 (D.Md. 2015), but "[a] poor performance rating does not in itself constitute an adverse employment action." *Jeffers*, 264 F.Supp.2d at 330.

Plaintiff recites essentially the same "adverse employment actions" in the Discrimination Claims as she does in the Retaliation Claims: "a lower evaluation, harassment, refusal of an accommodation, and ultimate transfer," for the Gender Discrimination claim and "violat[ion of] the light duty conditions" and "a lower performance

evaluation" for the Pregnancy Discrimination claims. Neither the harassment, nor the lower evaluation, nor Plaintiff's transfer constitute "adverse employment actions" as none of these adversely affected "the terms, conditions, or benefits of the plaintiff's employment[.]" *James*, 368 F.3d at 375. Further, it is again worth noting that Plaintiff's transfer was seemingly voluntary – which, for obvious reasons, weighs strongly against a finding that it constituted an adverse employment action. *See Pollard v. Baltimore County Bd. Of Educ.*, 65 F.Supp.3d 449 (D. Md. 2014).[1]

Because plaintiff has failed to establish any cognizable adverse employment action – discriminatory or otherwise – the court will grant Defendant's motion for summary judgment as to these claims.

### 4. The ADA Claims

Plaintiff brings three claims under the ADA: 1) a Disparate Treatment Claim, 2) a Failure to Accommodate Claim, and 3) a Retaliation claim. A plaintiff claiming disparate treatment under the ADA must demonstrate 1) that she had a disability as defined in the ADA, 2) that she was a qualified individual, and 3) that the employer took an adverse action against her on account of the disability. *See Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 685-86 (4th Cir. 1997). In order to establish a failure to accommodate claim, Plaintiff must

---

[1] As for the violation of light duty conditions, this is redundant of Plaintiff's failure to accommodate claim under the ADA and is addressed below.

show that 1) she was an individual who had a disability within the meaning of the ADA, 2) the employer had notice of this disability, 3) with reasonable accommodation she could perform the essential functions of the position; and 4) the employer refused to make such accommodations. *See Wilson v. Dollar General Corp.*, 717 F.3d 337, 345 (4th Cir. 2013).

For both the disparate treatment, and the failure to accommodate claims then, Plaintiff must establish that she actually suffered from a disability. For the retaliation claim, however, "a plaintiff is not required to prove the conduct he opposed was actually an ADA violation. Rather, [s]he must show [s]he had a 'good faith belief' the conduct violated the ADA." *Schmidt v. Town of Cheverly, MD.*, 212 F.Supp.3d 573, 581 (D.Md. 2016) (citing *Reynolds v. Am. Nat. Red Cross*, 701 F.3d 143, 154 (4th Cir.2012)).

### a. Plaintiff's Alleged Disability

The question of whether a plaintiff is disabled under the ADA, "and therefore can bring a claim under the statute, is a question of law for the court, not a question of fact for the jury." *Rose v. Home Depot U.S.A., Inc.*, 186 F. Supp. 2d 595, 608 (D.Md. 2002) (citing *Hooven–Lewis v. Caldera*, 249 F.3d 259, 268 (4th Cir.2001)).

Under the ADA, a disability is any one of the following: "(A) a physical ... impairment that substantially limits one or more ... major life activities ...; (B) ... a record of such an impairment; or (C) [when an individual is] regarded as having such impairment.'" *See*

*Rohan v. Networks Presentations LLC*, 375 F.3d 266, 273 (4th Cir. 2004) (quoting 42 U.S.C. § 12102(2) (ADA definition)). The Fourth Circuit has further explained that "'Substantially limits' means, inter alia, significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *Rhoads v. F.D.I.C.*, 257 F.3d 373, 387 (4th Cir. 2001) (internal quotations and citations omitted.)

"Significantly, a plaintiff cannot state a claim under the ADA by alleging that she was discriminated against due to her pregnancy alone, because pregnancy is not a disability under the ADA." *Wonasue*, 984 F.Supp.2d at 488. Plaintiff's ADA claim, then, rests on the complications of her pregnancy.

The Fourth Circuit has addressed pregnancy complications in a Rehabilitation Act case which uses "the law applicable to the Americans with Disabilities Act." *Brockman v. Snow*, 217 Fed.Appx. 201, 208 (4th Cir. 2007) (citing *Myers v. Hose*, 50 F.3d278, 281 (4th Cir. 1995). There, the court held that:

> Even if we assume that pregnancy complications may constitute a disability, Brockman's evidence falls far short of showing that she was substantially limited in a major life activity. The only evidence Brockman proffers in this regard is her doctor's note stating that she should be on bed rest "until further notice," and the claim that the doctor orally instructed her not to walk long distances. Significantly, Brockman's own

actions directly contradict her assertion that she was substantially limited in walking, as she walked, stood, and performed other normal work functions when she came back to the office of her own accord. It is not enough that her ability to walk be limited – it must be substantially limited. *See* 29 C.F.R. § 1630.2(j)(1). Brockman offers no evidence of the duration of her impairment, nor of its severity, both factors that would point to a finding of a substantial limitation. As she does not present sufficient evidence to show that she was substantially limited in a major life activity, Brockman's RA claim fails and we find that the district court's grant of summary judgment was proper on this issue.

*Brockman*, 217 Fed.Appx at 209.

While *Brockman* left open the possibility that "complications due to pregnancy can constitute a disability under the [ADA]," *id.*, the court made it clear that pregnancy complications would still need substantially to limit a major life activity in order to do so. *Id.* Courts outside this circuit have reached the same conclusion. *See, e.g., Conley v. United Parcel Serv.*, 88 F.Supp.2d 16, 19–20 (E.D.N.Y. 2000) (collecting cases and noting that "[c]ourts have generally held that complications arising from pregnancy do not constitute a disability under the ADA.")[2]

---

[2] The Fourth Circuit has noted that 2008 Amendments to the ADA were intended to loosen the requirements for establishing the existence of a disability. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 572 (4th Cir. 2015). While the 2008 amendment "abrogated earlier inconsistent caselaw," *id.*, *Wonasue*, 984 F.Supp.2d 480, notably post-dates the amendment. What is more, the reasoning of *Brockman*, 217 Fed.Appx. 201, remains persuasive. The emphasis on "whether an individual's impairment is a disability under the ADA should not demand extensive analysis," *Jacobs*, 780 F.3d at 572. That

In this case, the record is undisputed that Cpl. Hamilton was not "substantially limited" in any major life activity. Cpl. Hamilton contends that the complications from her pregnancy limited her because her doctor told her she could not drive more than 60 miles a day. Assuming, arguendo, that driving constitutes a major life activity, a limitation to fewer than 60 miles a day is not a "substantial" limitation. Under the analysis in *Brockman*, "It is not enough that her ability to [drive] be limited – it must be substantially limited."

Because Cpl. Hamilton has not established that her pregnancy complications *substantially* limited a major life activity, the court will grant summary judgment in favor of Defendants on Counts IV and VI of the Amended Complaint.

### b. The ADA Retaliation Claim

Again, in establishing an ADA retaliation claim, "a plaintiff is not required to prove the conduct he opposed was actually an ADA violation. Rather, [s]he must show [s]he had a 'good faith belief' the conduct violated the ADA." *Schmidt*, 212 F.Supp.3d at 581. Plaintiff must still, however, meet the elements of a *prima facie* case: 1) that she engaged in a protected activity, 2) that she suffered an adverse

---

said, the amendment did not entirely eliminate the requirement that a claimed disability must substantially limit a major life activity in order to constitute a disability. Courts have continued to apply this requirement in analyzing whether pregnancy-related complications constitute disabilities. *See, e.g.*, *Brown-Wicks v. PPE Casino Resort Maryland, LLC*, No. GJH-18-2576, 2019 WL 3778677, at *3 (D. Md. Aug. 9, 2019); *Saah v. Thumel*, No. CV RDB-15-2425, 2017 WL 491221, at *6 (D. Md. Feb. 7, 2017).

action, and 3) a causal link exists between the protected conduct and the adverse action. *See Reynolds v. Am. Nat. Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012). Plaintiff relies on the same elements mentioned in her other retaliation claims: that 1) she engaged in protected activity by complaining "regarding her treatment by Sergeant Manley," (ECF No. 49-1, at 32); 2) Plaintiff suffered an adverse employment action when she "was forced to travel to Sgt. Manley or risk being in violation of orders and then forced to complete a significant grievance process while dealing with suffering a miscarriage, *id*. at 39; and 3) there was a causal link between her complaints and the above-stated adverse employment action, *id*. at 40.

Plaintiff's arguments for causation – and indeed her argument that she suffered an adverse employment action – are deeply confusing. Plaintiff seems to argue that she suffered multiple adverse employment actions, implying in her "causal link" section that her employer's failure to notify her of deadlines to appeal her performance review constituted adverse employment action. *Id*. at 39. She also implies that her lower performance review somehow had to do with her taking the protected action of complaining about her disability: "Plaintiff complained about her treatment after each discreet act and suffered comments indicating below-satisfactory performance and was not provided full information regarding grieving [sic] her appraisal." *Id*. at 42. At another point, Plaintiff sums up the alleged adverse

employment actions in her ADA retaliation claim as "poor comments along with inadequate information." *Id*.

Plaintiff's allegations of a causal link between her protected activity and adverse employment actions against her are conclusory and confusing. Further, the alleged adverse employment actions – a poor(er) performance review, being forced to make three trips to Sgt. Manley, and her employer's failure to notify her of an appeal deadline – are definitively not "materially adverse" as none are remotely suited to "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern,* 548 U.S. at 67–68.

Because Plaintiff has failed to make out a *prima facie* case of retaliation under the ADA, the court will grant summary judgment in favor of Defendant on Count V of the Amended Complaint.

### C. Timeliness of Plaintiff's Opposition

Finally, in its Reply Memorandum of Law in Support of Motion for Summary Judgment (ECF No. 53), Defendant argues that "Plaintiff's Opposition (ECF Nos. 49 & 49-1) should be stricken because it was untimely filed." Defendant argues that Plaintiff's opposition brief was untimely because it was filed on February 27, 2019. (ECF No. 53, at 1). The court's paperless order of January 17, 2019 (ECF No. 43), however, stated that: "Plaintiff's response to motion for summary judgment is now due by March 1, 2019." Accordingly, Plaintiff's Opposition was timely filed and will not be stricken.

### III. Motion to Strike

Cpl. Hamilton seeks to strike certain allegations regarding her personal life in Defendant's motion for summary judgment. She has sought to do so under Rule 12(f), which pertains to *pleadings* as opposed to *papers*. This motion will be denied as improper.

### IV. Motions to Seal

Defendant has asked that its Motion to File Under Seal (ECF No. 52) "be temporarily granted regarding Defendant's Opposition to Plaintiff's Motion to Strike and Opposition to Motion to Seal until a ruling is made by this Court." (ECF No. 52, at 2). Plaintiff also asks that "Plaintiff's Reply Memorandum to Defendant's Opposition to Motion to Strike or Seal be placed under seal." (ECF No. 52, at 1). The court will deny the motion to strike, but, in light of the sensitive personal information contained in the parties' papers, grant the motions to seal: all papers currently filed under seal will remain so. Redacted versions of Plaintiff's papers have already been filed publicly.

### V. Consent Motion for Leave to File Excess Pages

Pursuant to Local Rule 105.3, memoranda in opposition a motion are not to exceed thirty-five (35) pages, exclusive of attachments, absent leave of the court. This motion (ECF No. 46) – filed only a day prior to the filing of a thirty-nine (39) page opposition – seeks leave to exceed the maximum allotted page number by six pages. According to Cpl. Hamilton, because this addition will not prejudice

the Defendant "as it responds only to the assertions contained and involved in Defendant's Motion for Summary Judgment[,]" the court should grant her leave to file a longer than usual opposition. (ECF No. 46-1, at 2).

Although "[c]umbersome filings ... are a considerable drain on judicial resources," *Sampson v. City of Cambridge, Md.*, No. WDQ-06-1819, 2008 WL 7514365, at *3 (D.Md. June 5, 2008), Cpl. Hamilton's motion for leave to exceed the page limitation will be granted, and her brief will be considered in its entirety.

## VI.  Motion for Leave to File Sur-Reply

Plaintiff seeks leave to file a sur-reply in order to address the issue of timeliness regarding Plaintiff's opposition to summary judgment. (ECF No. 56).  The court, however, does not need the benefit of Plaintiff's sur-reply in order to decide the issue of timeliness. As sur-replies are disfavored and the decision of whether to allow one is squarely within the court's discretion, the court will deny this motion.

## VII. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment will be granted in part and denied in part; Plaintiff's motion to strike will be denied; both Plaintiff's and Defendant's motions to seal will be granted; Plaintiff's motion for leave to file excess pages will be granted; and Plaintiff's motion for leave to file a sur-reply will be denied.  A separate order will follow.


                                                  /s/
_____
DEBORAH K. CHASANOW
United States District Judge